### No. 2340.—M. B. Irwin *v.* Levy & Dieter.

The purchase of cotton during the late war by parties residing within the Federal lines of military occupation from persons residing within the rebel lines was prohibited by act of Congress. An agent who left the Federal lines of military occupation and went into the rebel lines and there made purchases of cotton which he shipped to the other side, is not therefore entitled to claim or recover from the persons who received the cotton any compensation for his services or to recover any part of the cotton or the proceeds thereof on account of a contract in relation to the purchase of the cotton, because such contract was illegal.

APPEAL from the Sixth District Court, parish of Orleans. *Cooley, J.* *Race, Foster & E. T. Merrick,* for plaintiff and appellee. *Samuel R.* and *C. L. Walker,* for defendants and appellants.

TALIAFERRO, J. The plaintiff sues for $28,088 04, alleged to be owing him on account of purchases of cotton made by him for the defendants, and which were delivered to them according to an agreement between the parties. The defendants put in a general denial, and in a supplemental answer, admitted that the plaintiff had some transactions in cotton operations with W. D. Smith, whereby he, under contract with Smith, did deliver to him a quantity of cotton at the time stated in plaintiff's petition and the accompanying account; but that these were matters with which the defendants had no manner of connection, and on account of which they are in no manner bound. They further allege that for all purchases of cotton made by the plaintiff on account of Smith, the plaintiff has been fully paid. Judgment was given in favor of the plaintiff for $5000, and defendants have appealed. From an examination of the record we deduce the following history of this case: In May, 1864, when the unusually high price of

cotton had induced speculations in that staple the defendants, merchants of New Orleans, entered into an agreement with William D. Smith, a resident of the parish of Point Coupée, to purchase cotton on speculation, Smith to have one-third the net proceeds. The plaintiff, it seems, being an active, industrious man, and with some means of his own, was engaged by this partnership to go about through the country and make purchases of cotton, and have it delivered at eligible points for shipment; and for all cotton so obtained and delivered ready for shipment, he was to be paid forty cents per pound, Levy & Dieter to to furnish the money to pay for it. The general superintendence of the business was under the control of Smith. Irwin purchased cotton chiefly if not entirely in the parishes of Point Coupée and Avoyelles, and had it hauled to points on the Mississippi and the Atchafalaya, where it could be put on boats and brought to New Orleans. Levy & Dieter, it appears, did furnish $21,891, which went towards the payment of the cotton purchased by Irwin and the balance remaining was put by the lower court in round numbers at $5000 and judgment was rendered for that sum. The defense is placed on two grounds, viz :

*First*—That defendants made no contract with Irwin; and they ignore him altogether as agent or in any other capacity. Second, that the traffic carried on at that time by parties living on opposite sides of the lines between the section of country under Federal control and that in hostility to the government, was unlawful, and any agreement in relation to such traffic null and void.

It is, we think, sufficiently established that the defendants did contract with the plaintiff for the purpose stated. Smith himself testifies that Levy, one of the defendants, introduced Irwin to him at the house of Smith, and that it was agreed between Smith, Levy & Irwin that the latter should buy cotton, to be delivered to Smith, for which Levy was to leave money to pay for the cotton, and that he did leave money at that time to the amount of $4500, and arranged for Irwin to get other money in the hands of Haggard, and that Irwin was to get forty cents per pound for good cotton delivered on the eastern bank of the Atchafalaya river. This testimony is corroborated by three other witnesses, two of whom prove the delivery of the cotton by Irwin. The defendants allege payment of the indebtedness charged by the plaintiff, and thereby admit that the debt did exist.

*Second*—That the transactions in cotton between these parties being in violation of a prohibitory law, the contract entered into by them is null, and can not be enforced by the courts. The plaintiffs meet this by evidence offered to show that these purchases of cotton were made under special permits issued by B. F. Flanders, a treasury agent at New Orleans, and in conformity with the regulations of the Treasury Department at Washington, authorized to be made by the fifth section

of the statute, approved thirty-first of July, 1861, and the President's proclamation issued in conformity therewith. But a rather vexed question of fact here presents itself, and that is, whether the cotton purchased by the plaintiff in these transactions was really purchased within the lines of military occupation of the Federal armies. For, conceding that the permits were properly issued, and that Irwin was in point of fact resident within Federal lines, which is not clear, still the permits only extended to the purchasing of cotton within those lines. A sharp contest was made by the parties in their evidence on this point. It is probable that the greater part of Irwin's purchases were made west of the Atchafalaya. It is to be inferred from the testimony that during the expedition of General Banks up the Red river there were few if any Confederate troops in that district of country, and some of the purchases, it seems, were made during that time. The interval of non occupation and control of that part of the parish of Avoyelles by rebel forces was brief; for immediately upon the retreat of General Banks all that part of the country with the exception of the port of Morganza, was occupied by them. It is not shown that there were Federal forces stationed at that time (excepting at Morganza), either in the parish of Pointe Coupée or the parish of Avoyelles. The conclusion we are forced to come to from the evidence is, that there was not at the time of these purchases of cotton by the plaintiff such an occupancy by the Federal forces of the section of country within which the purchases were made, as would justify the belief that the transactions took place within the Federal lines, according to the purpose and intendment of Congress by the act permitting, under certain conditions, commercial intercourse in the insurgent States within those portions thereof under the control of the national armies. With this view of the case it results that the traffic of the parties engaged in this litigation being in contravention of a prohibitory law, it must be pronounced that the contracts they entered into in the course of their illicit trade are null and void, and that this suit can not be entertained.

It is therefore ordered, adjudged and decreed that the judgment of the district court be annulled, avoided and reversed. It is further ordered that this suit be dismissed at plaintiff's costs.

WYLY, J., being absent took no part in this decree.

### ON REHEARING.

LUDELING, C. J. After a careful re-examination of the evidence in this case, the conviction that the cotton was purchased inside the Confederate lines is forced upon our minds. We are, therefore, constrained to adhere to the conclusion heretofore announced in this case; and it is ordered that the judgment rendered in this case on the twentieth of November, 1871, remain undisturbed.